Richard D. McCune, State Bar No. 132124
rdm@mccunewright.com
David C. Wright, State Bar No. 177468
dcw@mccunewright.com
Kristy M. Arevalo, State Bar No. 216308
kma@mccunewright.com
McCUNEWRIGHT LLP
2068 Orange Tree Lane, Suite 216
Redlands, California 92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Edward J. Chong, State Bar No. 201409
edlawla@gmail.com
Law Offices of Edward J. Chong and Associates
3325 Wilshire Blvd., Suite 1250
Los Angeles, California 90010
Telephone: (213) 386-1990
Facsimile: (213) 386-1800

Attorneys for Plaintiff ELITE LOGISTICS CORPORATION,
on behalf of itself and all others similarly situated

BY
2011 APR -7 PM 3:32
CLERK U.S. DISTRICT COURT
CENTRAL DIST OF CALIF.
RIVERSIDE
FILED

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

CV 11 - 02952 SJO (V8K)

| | |
|---|---|
| ELITE LOGISTICS CORPORATION, and on behalf of all others similarly situated, | Case No: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | 1) UNLAWFUL BUSINESS PRACTICES (CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200, *et. seq.*); |
| MOL (AMERICA), INC., and DOES 1-10, | 2) BREACH OF CONTRACT; |
| Defendant. | **DEMAND FOR JURY TRIAL** |

///

///

-1-

**CLASS ACTION COMPLAINT**

Plaintiff ELITE LOGISTICS CORPORATION ("Plaintiff"), on behalf of itself and all others similarly situated, alleges on information and belief against Defendant MOL (AMERICA), INC., and DOES 1-10, inclusive, the following:

## I

## INTRODUCTION AND SUMMARY OF ACTION

1.     This is a civil action primarily seeking restitution and disgorgement of all profits gained by Defendant's unlawful levying of per diem, detention, or demurrage charges on intermodal motor carriers in violation of California Business & Professions Code section § 22928.

2.     Plaintiff also seeks remedies for Defendant's breach of the Uniform Intermodal Interchange and Facilities Access Agreement.

3.     Plaintiff ELITE LOGISTICS CORPORATION is a freight transportation company doing business with multiple marine equipment providers, including but not limited to, Defendant.  Plaintiff, and others similarly situated, contract with marine equipment providers to transport shipping containers from seaports throughout the State of California to destinations throughout the United States.

4.     The Uniform Intermodal Interchange and Facilities Access Agreement ("UIIA") administered by The Intermodal Association of North America, governs the interchange and use of equipment in intermodal interchange service.  Plaintiff, and others similarly situated, and Defendant are governed by the UIIA.  A copy of the UIIA is attached hereto as Exhibit 1.

5.     Additionally, Plaintiff, and all others similarly situated, and Defendant are bound by California statutes specifically concerning intermodal marine terminals.

6.     California Business & Professions Code § 22928, prevents an intermodal marine equipment provider or terminal operator from imposing per diem, detention, or demurrage charges on an intermodal motor carrier on a weekend or holiday.

**CLASS ACTION COMPLAINT**

7.     Plaintiff alleges that Defendant was and is unlawfully charging it, and others similarly situated, per diem, detention, and/or demurrage charges for weekends and holidays in violation of § 22928.

8.     Plaintiff further alleges that Defendant breached the provisions of the UIIA.

## II

## PARTIES

9.     Plaintiff ELITE LOGISTICS CORPORATION is, and at all times relevant to this Complaint was, a freight transportation company incorporated in the State of California, with its principle place of business at 16901 S. Keegan Avenue, Carson, California 90248.

10.    Defendant MOL (AMERICA), INC. is, and at all times relevant to this Complaint was, a company incorporated in the State of Delaware, with its principal place of business at 160 Fieldcrest Avenue, Edison, New Jersey 08818.  Defendant MOL (AMERICA), INC., is, and was at all times relevant herein, doing business in and/or having directed its activities in California, and specifically this judicial district.

11.    Plaintiff is unaware of the true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants DOES 1-10, inclusive, or any of them, and therefore sues these Defendants, and each of them, by such fictitious names.  Plaintiff will seek leave of this Court to amend this complaint when the status and identities of these Defendants are ascertained.

12.    At all times relevant herein, Defendant and Does 1-10 were the agents of each other, and in doing the things alleged herein, each Defendant was acting within the course and scope of its agency and was subject to and under the supervision of its co-defendants.

///
///
///
///

-3-

**CLASS ACTION COMPLAINT**

### III

### JURISDICTION AND VENUE

13.    This Court has original jurisdiction of this action pursuant to 28 U.S.C. § 1332.  The amount in controversy in this action is well over $75,000 exclusive of interest and costs, as to Plaintiff and the class.

14.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).  A substantial portion of the events and omissions giving rise to this lawsuit occurred in this judicial district, and the Court has personal jurisdiction over each of the parties as alleged throughout this Complaint.  Additionally, the UIIA provides that venue is proper as to any monetary obligations between motor carriers and marine operators by reason of equipment usage charges at the situs of the transaction giving rise to the requested damages.

### IV

### GENERAL FACTUAL ALLEGATIONS

15.    Defendant MOL (AMERICA), INC., contracts with freight transport companies such as Plaintiff ELITE LOGISTICS CORPORATION to transport and unload its shipping containers from ports to various destinations throughout the United States.

16.    International trade and goods movement are critical elements of the California economy, representing $350 billion in annual dollar value, and the state's seaports handle and transport much of this material for California and the nation. California has three of the nation's largest container ports: Los Angeles, Long Beach and Oakland.  The Ports of Los Angeles and Long Beach process nearly 45% of the nation's imports, including 60% of Asian imports shipped to West Coast port facilities.

17.    Most of these goods and material are transported by cargo containers carried on truck vehicles.  Marine terminal operators at the state's seaports provide these containers under contractual agreements to truck operators and the material is then

CLASS ACTION COMPLAINT

1  transported from the ports to warehouses, retail establishments, manufacturing facilities,

2  and railyards.

3       18.    Many of these truck operators are deployed by small trucking companies

4  (more than 300 operate in the Los Angeles area alone) licensed to conduct business in

5  California as port trucking entities.  The trucking firms, either directly or through brokers,

6  contract with the cargo shippers to provide the independent trucking operators (owner

7  operators/independent contractors).  This arrangement is completed through the use of

8  lease agreements involving the trucking firms and the operators.

9       19.    The contracts between the truck operators and marine providers state that

10  during the transport process, the motor carrier is given an allotment of "free days" to pick

11  up, transport, and return the container to the marine provider at the port.  Per diem

12  charges are then levied on the motor carrier when the container, also known as

13  "intermodal equipment," is not returned by the end of the allowable free time to its

14  origin, or another location, as agreed to by the contracting motor carrier and marine

15  provider.  Demurrage charges are levied on the motor carrier when the container is not

16  picked up within the allowable free time.

17       20.    California Business & Professions Code § 22928 provides, in pertinent part,

18  that:

19         (b) An intermodal marine equipment provider or
intermodal marine terminal operator shall not impose per diem,

20  detention, or demurrage charges on an intermodal motor carrier
relative to transactions involving cargo shipped by intermodal

21  transport under any of the following circumstances:

22         (1) When the intermodal marine or terminal truck gate is
closed during posted normal working hours.  No per diem,

23  detention, or demurrage charges shall be imposed on a weekend
or holiday, or during a labor dispute disruption period, or

24  during any other period involving an act of God or any other
planned or unplanned action that closes the truck gate.

25

26       21.    California Business & Professions Code § 22928 (Senate Bill 45) was

27  enacted to prohibit unfair monetary charges imposed by marine terminals on a truck

28

**CLASS ACTION COMPLAINT**

driver for pick up or return of specified equipment used for the transporting of cargo goods from California seaports outside usual working days.

22.     Senate Bill 45 was intended to establish certain protections and prohibit marine terminals from penalizing or imposing certain charges on truck operators related to the transportation of goods from the state's seaports and the delayed pick-up or return of empty or loaded cargo containers caused by charging for weekend days, holidays, and/or other days in which the intermodal marine terminal was closed.

23.     According to the legislative history for section 22928, "per diem," "detention," or "demurrage" means a charge imposed by an equipment provider for late pick-up or returns of any empty or loaded intermodal container and chassis.

24.     "Intermodal marine terminal" means a marine terminal location or facility that engages in discharging or receiving equipment owned, operated, or controlled by an equipment operator.

## V

## CLASS ACTION ALLEGATIONS

25.     Plaintiff, and all other similar intermodal motor carriers throughout California, were unlawfully charged per diem, detention, and/or demurrage charges on weekends and/or holidays in violation of California Business & Professions Code § 22928.

26.     Plaintiff brings this action on behalf of itself and a plaintiff class defined as follows:

> All California intermodal motor carriers who were charged and paid unlawful per diem detention, and/or demurrage charges for weekend days and holidays, in violation of California Business & Professions Code § 22928, from April 7, 2007, to the present.

Excluded from this class is any entity in which Defendant has a controlling interest, and Defendant's officers or director.  Plaintiff, and those similarly situated as described in the preceding paragraph, may be collectively referred to herein as "The Class Plaintiffs."

CLASS ACTION COMPLAINT

27.     This action is brought as a class action and may properly be so maintained pursuant to the provisions of the Federal Rules of Civil Procedure 23(a) and 23(b). Plaintiff reserves the right to modify the class definition and the class period based on the results of discovery.

28.     **Numerosity of the Class** – The class members are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes that there are at least hundreds of intermodal motor carriers throughout the State of California.  Because the class members may be identified through business records regularly maintained by Defendant and its employees and agents, the number and identities of class members can be ascertained.  Members of the class can be notified of the pendency of this action by mail and supplemented by published notice, if necessary;

29.     **Existence and Predominance of Common Questions of Fact and Law** – There are questions of law and fact common to the class.  These questions predominate over any questions affecting only individual class members.  These common legal and factual issues include, but are not limited to:

a.     Whether Defendant unfairly and unlawfully charged class members per diem detention, and/or demurrage charges for weekends and/or holidays, in violation of California Business & Professions Code § 22928;

b.     Whether Defendant's conduct is an express breach of the terms of the UIIA; and

c.     Whether Defendant's conduct as described above constitutes unlawful, unfair, or fraudulent business acts or practices in violation of California Business and Professions Code § 17200 *et seq.*;

30.     **Typicality** – The claims of the representative Plaintiff are typical of the claims of each class member.  Plaintiff, like all other class members, has sustained damages arising from Defendant's violations of the law, as alleged herein.  The representative Plaintiff and the class members were similarly harmed by the same unlawful, unfair, and systematic pattern of misconduct engaged in by Defendant.

-7-

**CLASS ACTION COMPLAINT**

31. **Adequacy** – The representative Plaintiff will fairly and adequately represent and protect the interests of the class members and has retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation. There are no material conflicts between the claims of the representative Plaintiff and the class members that would make class certification inappropriate. Class counsel will vigorously assert the claims of all class members.

32. **Predominance and Superiority** – This suit may be maintained as a class action under Federal Rules of Civil Procedure 23(b)(3) because questions of law and fact common to the class predominate over the questions affecting only individual members of the class and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct. Further, it would be virtually impossible for class members to individually redress effectively the wrongs done to them. Even if class members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

33. Plaintiff contemplates the eventual issuance of notice to the proposed class members setting forth the subject and nature of the instant action. Upon information and belief, Defendant's own business records can be used for the contemplated notices. To the extent that any further notices may be required, Plaintiff would contemplate the use of additional media and/or mailings.

-8-

**CLASS ACTION COMPLAINT**

34.     In addition to meeting the statutory prerequisites of a class action, this action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

a.     Without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the class will create the risk of:

i.     Inconsistent or varying adjudications with respect to individual class members which would establish incompatible standards of conduct for the parties opposing the class; or

ii.     Adjudication with respect to individual class members which would as a practical matter be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests;

b.     The parties opposing the class have acted or refused to act on grounds generally applicable to each member of the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole; or

c.     Common questions of law and fact exist as to the members of the class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

i.     The interests of the class members in individually controlling the prosecution or defense of separate actions;

ii.     The extent and nature of any litigation concerning controversy already commenced by or against class members;

iii.     The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

iv.     The difficulties likely to be encountered in the management of a class action.

///

-9-

**CLASS ACTION COMPLAINT**

# VI

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### UNLAWFUL BUSINESS PRACTICES UNDER

### CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200 *et seq.*

### (Against Defendant and Does 1-10)

35.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

36.   Defendant's acts and practices as described herein constitute unfair and unlawful business acts and practices, in that Defendant's practices violates California Business & Professions Code § 22928.

37.   Defendant's unfair and unlawful business acts and practices are described herein and include, but are not limited to, the practice of levying per diem, detention, and/or demurrage charges on Plaintiff, and all others similarly situated, on weekends and holidays, in violation of California Business & Professions Code § 22928.

38.   Under Business and Professions Code §17203, Plaintiff seeks an order enjoining Defendant from engaging in the unfair and unlawful practices and acts identified herein.  Said code section also provides for equitable monetary relief so as to preclude the retention of all monies improperly obtained by Defendant as a result of such practices and acts.

39.   Plaintiff, and all others similarly situated, has been damaged by Defendant's unfair and unlawful conduct.

40.   Pursuant to California Business & Professions Code § 17200 and 17203, Plaintiff seeks relief as prayed for below.

///

///

///

///

-10-

**CLASS ACTION COMPLAINT**

## SECOND CAUSE OF ACTION

## BREACH OF CONTRACT

### (Against Defendant and Does 1-10)

41.     Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

42.     Plaintiff, and all others similarly situated, and Defendant, at all times relevant to this complaint, were bound by the provisions of the UIIA and were signatories thereto.

43.     Plaintiff, and all others similarly situated, did all, or substantially all, of the significant things that the UIIA required it to do.

44.     Defendant failed to do something that the contract required it to do, namely comply with all of the terms of the UIIA.  The UIIA specifically provides the following:

> G. General Terms
>
> 11.     Compliance of Law: The Parties shall obey all federal, state and local laws, rules and regulations including those pertaining to the transportation of hazardous material.

45.     Defendant breached the UIIA by levying per diem, detention, and/or demurrage charges on Plaintiff and the class, in violation of California Business & Professions code § 22928.

46.     Plaintiff, and all others similarly situated, was harmed by Defendant's breach of contract in failing to comply with the provisions of the UIIA.

## VII

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, prays for the following relief:

A.     For an order certifying the class and appointing Plaintiff and his counsel to represent the class;

B.     For an order awarding Plaintiff and the class compensation for economic losses, including but not limited to, disgorgement of all unlawfully obtained per diem,

-11-

CLASS ACTION COMPLAINT

1   detention, and/or demurrage charges, in such amounts as may be proven at trial, and other
2   equitable relief as the Court deems proper;
3       C.      Judgment in favor of Plaintiff and against Defendant, for damages in such
4   amounts as may be proven at trial:
5       D.      For an order enjoining Defendant under California Business & Professions
6   Code § 17203 from engaging in business acts and practices, or any of them, which are
7   unlawful, unfair, or fraudulent, as alleged herein;
8       E.      Attorneys' fees as provided for by the UIIA;
9       F.      Pre- and post judgment interest; and
10      G.      Any and all further relief, both legal and equitable, that the Court may deem
11  just and proper.

13  Dated:  April 7, 2011                          MCCUNEWRIGHT LLP

15                                         By: _____
16                                               David C. Wright
17                                               Attorneys for Plaintiff

18                                 **JURY DEMAND**

20      Plaintiff, and all others similarly situated, hereby demands a trial by jury.

22                                         By: _____
23                                               David C. Wright
24                                               Attorneys for Plaintiff

-12-

**CLASS ACTION COMPLAINT**

EXHIBIT "1"

Developed By:                                    Effective:  April 14, 2011
The Intermodal Interchange
Executive Committee

# Uniform
# Intermodal
# Interchange
## And
# Facilities Access
# Agreement
## (U I I A)

Administered By:

**The Intermodal Association of North America**
**11785 Beltsville Drive, Suite 1100**
**Calverton, Maryland 20705-4048**
**Phone: Toll-Free (877)438-UIIA (438-8442) or  (301)474-8700**
**Fax:(301)982-3414 or (301)982-5478   Website: www.uiia.org**

**FORM 2**

## UNIFORM INTERMODAL INTERCHANGE
## AND
## FACILITIES ACCESS AGREEMENT

### (A Program of the Intermodal Association of North America)

### Participating Party Agreement

The Party named below agrees that by executing the Uniform Intermodal Interchange and Facilities Access Agreement (UIIA) it will be bound by the provisions of the UIIA, and subsequent amendments and/or revisions of that Agreement, and any addendum thereto, that does not conflict with the terms of this Agreement, which govern the interchange and use of Equipment in intermodal interchange service. The Provider named below agrees that in its interchange activities with Motor Carrier participants who are signatories to the Agreement, this Agreement will be the only Agreement it will use, unless superseded in whole by a separate bilateral written agreement.

This Agreement shall be effective unless cancelled in writing, by mutual consent of the Parties, or by any Party upon thirty (30) days prior Notice to the other Party. A copy of the required written Notice must be provided to the President of IANA at the time it is issued. **[Revised 04/11/07]**

**COMPANY NAME:**_____

**AUTHORIZED BY:** (Print or Type)_____

**SIGNATURE:**_____ **TITLE:**_____ **DATE:**_____

**BUSINESS ADDRESS:**_____
**(Mailing Address)**              No.              Street              City

_____
State/Province    Zip/Postal Code    Phone No.    Fax    E-Mail

**Indicate Nature of Business:** _____ Motor Carrier _____ Provider

**If Motor Carrier, please check all that apply to your business operations:**

❑ For Hire   ❑ Private   ❑ Interstate   ❑ Intrastate   ❑ Commercial Zone/Terminal Area Operator

**Standard Carrier Alpha Code (SCAC):**_____

**MC Number:** _____ **DOT Number:** _____

**Tax Identification No. or Canadian Business Number:** _____

Dated:_____ By: _____
                              Assistant Vice President
                              Intermodal Information Services

**FORM 2**

## UNIFORM INTERMODAL INTERCHANGE
## AND
## FACILITIES ACCESS AGREEMENT

### (A Program of the Intermodal Association of North America)

### Participating Party Agreement

The Party named below agrees that by executing the Uniform Intermodal Interchange and Facilities Access Agreement (UIIA) it will be bound by the provisions of the UIIA, and subsequent amendments and/or revisions of that Agreement, and any addendum thereto, that does not conflict with the terms of this Agreement, which govern the interchange and use of Equipment in intermodal interchange service. The Provider named below agrees that in its interchange activities with Motor Carrier participants who are signatories to the Agreement, this Agreement will be the only Agreement it will use, unless superseded in whole by a separate bilateral written agreement.

This Agreement shall be effective unless cancelled in writing, by mutual consent of the Parties, or by any Party upon thirty (30) days prior Notice to the other Party. A copy of the required Notice must be provided to the President of IANA at the time it is issued. **[Revised 04/11/07]**

**COMPANY NAME:**_____

**AUTHORIZED BY:** (Print or Type)_____

**SIGNATURE:**_____  **TITLE:**_____  **DATE:**_____

**BUSINESS ADDRESS:**_____
**(Mailing Address)**          No.              Street          City

_____
State/Province      Zip/Postal Code      Phone No.      Fax      E-Mail

**Indicate Nature of Business:** _____ Motor Carrier _____ Provider

**If Motor Carrier, please check all that apply to your business operations:**

❑ For Hire    ❑ Private    ❑ Interstate    ❑ Intrastate    ❑ Commercial Zone/Terminal Area Operator

**Standard Carrier Alpha Code (SCAC):**_____

**MC Number:** _____    **DOT Number:** _____

**Tax Identification Number or Canadian Business Number:** _____

**The provisions of this agreement shall become effective on the date accepted by the Association of the above named carrier and published in the list of subscribers or supplements thereto.**

By: _Debbie Jasko_
_____
**Assistant Vice President**
**Intermodal Information Services**

# Table of Contents

**Page Number**

**Section A.  Purpose** ....................................................................... 1

**Section B.  Definitions of Terms** ............................................... 1-2

**Section C   Premise Access** ........................................................ 2

**Section D   Equipment Interchange** ......................................... 2-3

> Notification of Equipment Availability ................................ 2
> Equipment Interchange Receipt ........................................... 3
> Equipment Condition ............................................................ 3

**Section E   Equipment Use** ........................................................ 3-6

> E.1 – Equipment Return ........................................................ 3-4
> E.2 -  Lost, Stolen or Destroyed Equipment ........................ 4
> E.3 – Equipment Damage ...................................................... 4-5
> E.4 – Tires ............................................................................. 5
> E.5 – Disposal of Dunnage .................................................. 5
> E.6 – Free Days and Use Charges ........................................ 5

**Section F   Liability, Indemnity and Insurance** ....................... 6-7

> F.1 -  Fines and Citations ..................................................... 6
> F.2 -  Independent Contractors ............................................. 6
> F.3 -  Interchange of Equipment by Motor Carrier to Another Party .... 6
> F.4 -  Indemnification ........................................................... 6
> F.5 -  Notice of Filed Claims ................................................ 6
> F.6 -   Insurance ..................................................................... 7
> F.7 -   Provider – Obtaining Evidence of Insurance ............. 7

**Section G   General Terms** ......................................................... 7-10

> G.1 – Entire Agreement ........................................................ 7
> G.2 -  Headings ..................................................................... 7
> G.3 – Waiver ......................................................................... 7
> G.4 -  Material Breach .......................................................... 8
> G.5 -  Assignment ................................................................. 8
> G.6 – Third Party Beneficiaries ........................................... 8
> G.7 – Governing Law ........................................................... 8
> G.8 – Venue .......................................................................... 8
> G.9 – Severability ................................................................. 8
> G.10 – Survival .................................................................... 8
> G.11 – Compliance of Law ................................................... 8
> G.12 – Force Majeure ........................................................... 9
> G.13 – Attorney's Fees ......................................................... 9
> G.14 – Notices ...................................................................... 9
> G.15 – Multiple Counterparts .............................................. 9
> G.16 – Term .......................................................................... 9-10

**Table of Contents (continued)**

|  | __Page Number__ |
|---|---|
| **Section H -  Default Dispute Resolution & Binding Arbitration Processes** | 10-11 |
| **Section I -  Execution Clause** | 11 |
| **Appendix I Administrative Procedures** | 12-15 |
| ➢   Section I - Administration and Implementation | 12-13 |
| ➢   Section II - Review Procedures for New or Revised Providers Addenda | 13-14 |
| ➢   Section III - Requests for Interpretation of Agreement Provisions | 14 |
| ➢   Section IV - Requests for Modifications to the Agreement | 14-15 |
| ➢   Section V -  Notice of Proposed Modifications to the Agreement and Comment Process | 15 |
| ➢   Section VI - Prerequisites for Participation | 15-16 |
| ➢   Section VII -  Party's Right to Terminate Participation | 16 |
| ➢   Section VIII – Compliance with Agreement | 16 |
| **Exhibits to the UIIA** | |
| ➢   Exhibit A – Motor Carrier Pre-trip inspection | 17 |
| ➢   Exhibit B -  Equipment Owner Responsibility Items Relating to Repairs Resulting from Normal Wear and Tear | 18 |
| ➢   Exhibit C -  Motor Carrier Responsibility Items Relating to Repairs During Interchange Period | 19 |
| ➢   Exhibit D – Mandatory & Binding Dispute Resolution Guidelines | 20-21 |
| **Provider Addendum Template** | 22 |

# UNIFORM INTERMODAL INTERCHANGE
# AND FACILITIES ACCESS AGREEMENT

A.  Purpose

The Parties to this Agreement hereby acknowledge their respective responsibilities in one Party's access to the Premises of the other for the purpose of interchanging intermodal transportation Equipment and further establish the terms and conditions under which such intermodal Equipment will be used.

B.  Definition of Terms

1.  Actual Cash Value: Replacement cost less depreciation as referred to on Equipment Owners' or Providers' Books.

2.  Addendum/Addenda: Providers' schedule of economic and commercial terms not appropriate for inclusion in the uniform Agreement and other terms and conditions of Equipment use. **[Revised 04/11/07]**

3.  Agreement: This Agreement or amendments thereto and Addendum/Addenda.

4.  Container:  An intermodal cargo carrying device capable of road transport when mounted on a chassis or other suitable device. **[Revised 11/18/09]**

5.  Contamination:  Damage resulting from release of a hazardous material or other substance in Equipment which prevents subsequent use of the Equipment without removal of the material or substance. **[Revised 10/22/04]**

6.  Damage:  Any condition caused by other than normal Wear & Tear and as described in either Exhibit B or any condition as described in Exhibit C to this Agreement. **[Revised 09/01/09]**

7.  Defect:  Any condition (including dents, scrapes, cuts or missing items) that may, or may  not, require the repair, replacement or renewal of items, but does not prevent the intended use of the Equipment. **[Revised 09/0109]**

8.  Destroyed:  Where the reasonable and customary cost to repair Equipment exceeds its Actual Cash Value or depreciated replacement value. **[Revised 07/25/07]**

9.  Equipment:  Equipment commonly used in the road transport of intermodal freight including, trailers, chassis, containers and associated devices, but excluding tractors. **[Revised 11/18/09]**

10. Equipment Owner: The holder of actual or beneficial title to the Equipment, regardless of the form of the title. **[Revised 04/11/07]**

11. Equipment Interchange Receipt (EIR): A document confirming the interchange of Equipment between Parties to this Agreement, or their agents.  The physical condition of the Equipment may be described by either Party within the EIR or via recorded images taken at the time of Interchange. **[Revised 04/11/07]**

12. Facility Operator: Party whose Premises are accessed for the purpose of effecting an interchange between signatories to this Agreement. **[Revised 02/24/06]**

13. Indemnitees: Provider, Equipment Owner and/or Facility Operator, as their interest may appear.

14. Interchange: The transfer of physical possession of Equipment under the Agreement.

15. Interchange Period: The period, commencing upon Interchange to Motor Carrier and concluding upon Interchange to Provider.

16. Motor Carrier: The Party being granted access to the Provider's facilities and/or having physical possession of the Equipment for the purpose of road transport or its designated agent or contractor.

17. Notice: A communication between Parties of this Agreement required by the terms of the Agreement.

18. Parties: The Provider, Motor Carrier and/or Facility Operator who are signatories to this Agreement. **[Revised 02/24/06]**

19. Per Diem: Charge to be paid when intermodal Equipment is not returned by the end of the allowable free time to its origin or to another location, as previously agreed to by the Parties. **[Revised 07/25/07]**

20. Premises: The property operated by Provider or Facility Operator for the purpose of Interchange. **[Revised 09/01/09]**

21. Provider: The Party authorizing delivery and/or receipt of physical possession of Equipment with a Motor Carrier.

22. Recorded Image:  A date and time stamped electronic image, which depicts the physical condition of the Equipment. **[Revised 04/11/07]**

23. Storage/Ocean Demurrage:  Charge to be paid when intermodal Equipment is stored on property. **[Revised 07/25/07]**

24. Wear and Tear: A loss or condition resulting from reasonable and normally anticipated use of Equipment that includes deterioration.  Deterioration is defined as a loss or condition resulting from the passage of time, exposure to elements and the repetitive normal and customary use of Equipment.  **[Revised 11/18/09].**

C.  Premises Access

1.  Provider and/or Facility Operator grants to Motor Carrier the right to enter upon its terminal facility for the sole purpose of completing an Interchange of Equipment.

2.  Nothing in this Agreement shall preclude Provider or Facility Operator from refusing access to a Motor Carrier for good cause shown. Provider or Facility Operator shall exercise this right in good faith, providing to Motor Carrier a written statement of the reason for its action by registered mail, e-mail or confirmed facsimile no less than three (3) business days prior to the suspension. **[Revised 11/08/10]**

D.  Equipment Interchange

1.  Notification of Equipment Availability

a.  If Provider and/or Facility Operator undertakes to notify Motor Carrier of Equipment availability, it represents that the Equipment will be available for Interchange when the Motor Carrier arrives. **[Revised 09/01/09]**

b.  Where it is notified, as provided herein, Motor Carrier must Interchange Equipment promptly upon notification. Motor Carrier will be responsible to Provider for the charges, as may be described in Provider's Addendum hereto, in the event Motor Carrier fails to remove Equipment during the free time provided in the Addendum.

2. Equipment Interchange Receipts

    a. At the time of Interchange, the Parties or their agents shall execute an Equipment Interchange Receipt and/or exchange an electronic receipt equivalent, which shall describe the Equipment and any Damage observable thereon at the time of Interchange, reasonable Wear and Tear excepted. The physical condition of the Equipment may be described by either Party within the EIR or via Recorded Images taken at the time of Interchange. **[Revised 05/12/10]**

    b. Each Party shall be entitled to receive a copy and/or an electronic receipt equivalent of the Equipment Interchange Receipt as described in D.2.a above. **[Revised 04/11/07]**

    c. If Recorded Images are taken at the time of Interchange, Damage will not be reported on ingate or outgate EIR. The words "Damage is captured on Recorded Images" will be printed on the Equipment Interchange Receipt. All such Recorded Images will be made available for each Party for a period of 1 year from Interchange. **[Revised 05/12/10]**

3. Equipment Condition

    a. Warranty: **WHILE PARTIES MAKE NO EXPRESS OR IMPLIED WARRANTY AS TO THE FITNESS OF THE EQUIPMENT, THEY RECOGNIZE AND AFFIRM THEIR RESPONSIBILITIES UNDER THE FEDERAL MOTOR CARRIER SAFETY REGULATIONS.**

        1) Motor Carriers will conduct a pre-trip inspection prior to departing with interchanged Equipment that will include those items set forth in Exhibit A to this Agreement. **[Revised 01/17/05]**

    b. Equipment controlled by Provider shall have a valid FHWA inspection sticker. Provider will reinspect and recertify the Equipment, at Motor Carrier's request, if the existing inspection will expire during the Addendum free time period of the Motor Carrier's use.

    c. Motor Carrier will reinspect and recertify the Equipment if the existing inspection will expire prior to the Motor Carrier's return of the Equipment to the Provider

    d. Motor Carrier will return the Equipment to the Provider in the same condition, reasonable Wear and Tear excepted.

        1) The responsibility for the repair and/or replacement of equipment items during the Interchange Period are listed in Exhibits B and C of this Agreement. **[Revised 07/25/07]**

        2) Motor Carrier and Provider will not issue an invoice for repair items equal to or less than $50 per unit per Interchange Period. Provider may, in its Addendum, adopt a different threshold amount as long as that amount is greater than $50 and applies to both Motor Carrier and Provider. **[Revised 07/25/07]**

        3) In any disputes arising in connection with classification of Wear and Tear, the Association of American Railroads TOFC/COFC Interchange Rules, Sections B, G, and F, shall be the controlling document.

E. Equipment Use

1. Absent a separate bilateral agreement in written or electronic form between the Parties, the Motor Carrier shall use the Equipment for only the purposes for which it was interchanged, not authorize use by others, and promptly return the Equipment after its interchange purpose is complete. The

Motor Carrier shall return the Equipment to the physical location at which the Equipment was received unless the Provider directs the Equipment to be returned to satellite locations as governed by 1) a written bilateral agreement between the Parties or 2) a notification from the Provider to the Motor Carrier via internet posting, e-mail, or shipping order.  Satellite location(s) are facilities which are within the same local commercial territory and support operations of the Provider for the location from which the Equipment was originally received.  Whenever a return location is changed, Provider must notify the Motor Carrier by e-mail by 16:00 p.m. local time the business day prior to the change becoming effective.  Motor Carrier must furnish the Provider with e-mail addresses to be used for Motor Carrier notification when return locations are changed.

An Addendum to this Agreement does not constitute a separate bilateral agreement.  **[Revised 11/18/09]**

2.   Lost, Stolen, or Destroyed Equipment

    a.   In the event the Equipment is lost, stolen from, or Destroyed by Motor Carrier, the method of settlement shall be the Actual Cash Value or the depreciated replacement value, as agreed between the Parties. **[Revised 09/01/09]**

    b.   In the event Motor Carrier is compelled to compensate Provider for loss or damage to Equipment due to the acts of third parties, Provider will assign to Motor Carrier its rights against such third party upon receiving payment in full from Motor Carrier.

    c.   When Equipment is lost, stolen or Destroyed, the Motor Carrier and Provider will follow the notification and invoicing processes as set forth in the Provider's Addendum.  If the Provider's Addendum does not contain notification and/or invoicing processes for lost, stolen, or Destroyed Equipment, the following will apply:

Motor Carrier shall promptly notify Provider when Equipment is lost, stolen, or Destroyed. Provider shall within thirty (30) days after receipt of such notification, secure and furnish to the Motor Carrier a written statement of the depreciated replacement value or Actual Cash Value of the Equipment, as agreed between the parties [or as set forth in Provider's Addendum].  Motor Carrier shall pay Provider the amount specified in the written statement within (30) days of the date of such written statement.  **[Revised 09/01/09]**

    d.   Provider will notify Motor Carrier within 18 months from the date of Interchange if Equipment is declared lost, stolen or Destroyed.  If Provider does not so notify Motor Carrier, the right to recover any associated charges or Actual Cash Value will be lost. **[Revised 09/01/09]**

3.   Damage to Equipment

    a.   Motor Carrier shall pay to Provider the reasonable and customary costs to repair Damages done to Equipment during Motor Carrier's possession. **[Revised 09/01/09]**

        1)   To be valid, invoices must detail the repairs done; include a copy of the actual repair bill upon which the invoice is based and include the factual documentation supporting the Provider's determination that the Motor Carrier is responsible.  In instances where a copy of the actual repair bill is not available to Provider, documentation containing the repair vendor's name, repair date, location and a control number that ties the documentation to the invoice provided to the Motor Carrier is acceptable, in lieu of the actual repair bill.  In the case of AGS gate transactions such documentation must include images depicting the

4

condition of the Equipment at the time the Motor Carrier to be charged both accepted and returned the Equipment. **[Revised 09/01/09]**

   b. Where the reasonable and customary cost to repair exceeds the casualty loss value as determined in Section E.2.a hereof, the Motor Carrier shall be obligated only for the lesser sum.

   c. Provider shall invoice Motor Carrier no later than the following timeframes:  If Motor Carrier is not invoiced within the established timeframes, the right of the Provider to recover such charges will be lost: **[Revised 11/05/08]**

      1) Standard Gate System (manned):  Not later than 165 calendar days.
      2) AGS Gate System (unmanned):  Not later than 120 calendar days following the interchange transaction giving rise to the bill.

4. Tires

   a. Repair of Damage to tires during Motor Carrier's possession is the sole responsibility of Motor Carrier, based on prevailing reasonable and customary repair costs and equipment use. **[Revised 09/01/09]**

   b. Repair of tires unrelated to Damage occurring during Motor Carrier's possession is the sole responsibility of the Provider, based on prevailing reasonable and customary repair costs and equipment use. **[Revised 09/01/09]**

5. Disposal of Dunnage

   a. Motor Carrier shall return Equipment with all dunnage, bracing, contaminants and debris removed and the floor swept.

6. Free Days and Use Charges

   a. Interchange of Equipment is on a compensation basis. Provider may permit some period of uncompensated use and thereafter impose use charges, as set forth in its Addendum.

   b. Motor Carrier shall be responsible for use and/or storage charges set forth in the Addenda.

   c. Provider shall invoice Motor Carrier for use and/or storage charges within sixty (60) days from the date on which Equipment was returned to Provider by Motor Carrier.   If Motor Carrier is not invoiced within the established timeframe, the right of the Provider to recover such charges will be lost. **[Revised 11/05/08]**

   d. Provider shall provide the Motor Carrier documentation as is reasonably necessary to support its invoice.

   e. Motor Carrier shall respond in writing to Provider's invoices within thirty (30) days, documenting with appropriate evidence its disagreement with any of Provider's invoices it believes to be incorrect.

   f. Motor Carrier will participate in good faith in Provider's established method of dispute resolution, as set forth in its Addendum.

F.  Liability, Indemnity, and Insurance

    1.  Fines, citations: Motor Carrier shall pay all fines arising out of its acts or omissions in the operation of Equipment during the Interchange Period.

        a.  Motor Carrier will provide a corrected copy of Equipment-related citations to Provider upon completion of Interchange.

    2.  Independent contractor status: No Party or its agents is the employee or agent of any other Party.

    3.  If the Equipment is interchanged by Motor Carrier or is otherwise authorized by Motor Carrier to be in the possession of other parties, the Motor Carrier shall be responsible for the performance of all terms of this Agreement in the same manner as if the Equipment were in the possession of the Motor Carrier, unless the written consent of Provider has been obtained.

    4.  Indemnity:

        a.  Subject to the exceptions set forth in Subsection (b) below, Motor Carrier agrees to defend, hold harmless and fully indemnify the Indemnitees (without regard to whether the Indemnitees' liability is vicarious, implied in law, or as a result of the fault or negligence of the Indemnitees), against any and all claims, suits, loss, damage or liability, for bodily injury, death and/or property damage, including reasonable attorney fees and costs incurred in the defense against a claim or suit, or incurred because of the wrongful failure to defend against a claim or suit, or in enforcing subsection F.4 (collectively, the "Damages"), caused by or resulting from the Motor Carrier's: use or maintenance of the Equipment during an Interchange Period; and/or presence on the Facility Operator's premises. **[Revised 01/17/05]**

        b.  Exceptions:  The foregoing indemnity provision shall not apply to the extent Damages:  (i) occur during the presence of the Motor Carrier on the Facility Operator's premises and are caused by or result from the negligent or intentional acts or omissions of the Indemnitees, their agents, employees, vendors or third party invitees (excluding Indemnitor); or (ii) are caused by or result from defects to the Equipment with respect to items other than those set forth in Exhibit A, unless such defects were caused by or resulted from the negligent or intentional acts or omissions of the Motor Carrier, its agents, employees, vendors, or subcontractors during the Interchange Period. **[Revised 1/17/05]**

    5.  Notice of Filed Claims:

        a.  Motor Carrier shall promptly notify Provider, Equipment Owner and/or Facility Operator of any claim arising against Motor Carrier under Section F.4, and shall also advise Provider, Equipment Owner and/or Facility Operator at that time of the legal defense undertaken regarding that claim. Failure of the Motor Carrier to timely provide such legal defense, and the undertaking of that legal defense by Provider, Equipment Owner and/or Facility Operator to protect such Party's respective interests, shall result in the Motor Carrier's bearing such reasonable attorney fees and costs incurred by the Provider, Equipment Owner and/or Facility Operator in providing such legal defense.

        b.  Provider, Equipment Owner and/or Facility Operator shall promptly notify Motor Carrier of any claim arising under Section F.4. which Provider, Equipment Owner and/or Facility Operator receives.  Provider, Equipment Owner and/or Facility Operator shall not undertake any legal defense of or incur any legal expenses pertaining to the claim submitted to the Motor Carrier, unless Motor Carrier fails to timely do so as provided in Section 5.a.

6

6. Insurance: To the extent permitted by law, Motor Carrier shall provide the following insurance coverages in fulfillment of its legal liability and obligations contained in this Agreement:

    a. A commercial automobile insurance policy with a combined single limit of $1,000,000 or greater, insuring all Equipment involved in Interchange including vehicles of its agents or contractors; said insurance policy shall be primary to any and all other applicable insurance and shall name the Provider as additional insured. The extent of Providers' additional insured status is limited to the provisions of Section F.4 hereof. **[Revised 09/01/09]**

    b. A commercial general liability policy with a combined single limit of $1,000,000 per occurrence or greater, of which no portion can be self-insured. **[Revised 04/11/07]**

    c. Motor Carrier shall have in effect, and attached to its commercial automobile liability policy, a Truckers Uniform Intermodal Interchange Endorsement (UIIE-1), which includes the coverages specified in Section F.4. Motor Carrier shall use endorsement form UIIE-1 (or other corresponding forms which do not differ from UIIE-1) in the most current form available to the insurance carrier. Evidence of the endorsement of the policy and the coverage required by this provision shall be provided to IANA by the insurance company.

    d. IANA shall receive a minimum of thirty (30) days advance Notice of any cancellation of such coverages.

7. The Provider agrees that it will obtain all information concerning Motor Carrier Certificates of Insurance from the Intermodal Association of North America, and that additional evidence of insurance will not be requested from Motor Carrier Participants.

G. General Terms

1. Entire Agreement: This Agreement, including its Addendum, but only to extent that its terms do not conflict with this Agreement, contain the entire Agreement between the Parties hereto. This Agreement supersedes all prior agreements and understandings, oral or written, if any, between the Parties except as contained herein. No modification or amendment of any of the terms, conditions or provisions herein may be made otherwise than by written Agreement signed by the Parties. **[Revised 04/11/07]**

This Agreement shall apply unless it is superseded in whole by a separate bilateral written contract.

2. Headings: The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

3. Waiver: The terms or conditions of this Agreement may be waived at any time by the Party entitled to the benefit thereof, but no such waiver shall be effective unless the same is in writing and no such waiver shall affect or impair the right of the waiving Party to require observance, performance or satisfaction either of that term or condition as it applies on a subsequent occasion or of any other term or condition hereof. The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach of the same or any other provision of this Agreement by either Party.

7

4. Material Breach: If it is determined that, at the time of Interchange, the Motor Carrier was not insured in accordance with Section F.6. of this Agreement, the Motor Carrier shall have been in material breach of this Agreement and the Agreement shall, subject to the survivability provisions hereof, terminate immediately pursuant to Section G.16.

   With the exception of Section G.4., no breach of this Agreement, either by an individual Motor Carrier or by an individual Provider/Facility Operator, shall affect the rights and obligations of that Motor Carrier or Provider/Facility Operator with all other Parties hereto.

5. Assignment: No Party shall assign this Agreement or any part hereof without the written consent of the other Parties provided that no such consent shall be required in the event of Provider's assignment to a successor-in-interest as a result of a merger or sale of substantially all of Provider's assets.

   Except as otherwise provided herein, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assign.

6. No Third Party Beneficiaries: Except as expressly provided herein, nothing in this Agreement shall entitle any person other than the Parties or their respective successors and mutually accepted assigns to any claim, cause of action, remedy or right of any kind. **[Revised 04/11/07]**

7. Governing Law: The laws of the state of Maryland, the location at the principal place of business of the Intermodal Association of North America shall govern the validity, construction, enforcement and interpretation of this Agreement without regard to conflicts of law principles.

8. Venue: Any action which may be brought to enforce or interpret this Agreement shall be brought in a trial court of competent jurisdiction as follows:

   a. As to questions of interpretation or enforcement of the Agreement, at the location of the principal place of business of the Intermodal Association of North America;
   b. As to questions of indemnification under the Agreement at the situs of the transaction giving rise to the requested indemnification;
   c. As to monetary obligations between the Parties by reason of Equipment usage charges at the situs of the transaction giving rise to the requested damages;
   d. As to monetary damages between the Parties arising out of physical damage to or loss of Equipment, at the situs at which the Equipment was last interchanged prior to such loss or damage.

9. Severability: If any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or enforceability shall not change or invalidate any other provisions hereof.

10. Survival: Cancellation of this Agreement notwithstanding, Motor Carrier shall remain obligated to return Equipment provided hereunder and otherwise perform its obligations outstanding at the time of cancellation.

11. Compliance of Law: The Parties shall obey all federal, state and local laws, rules and regulations including those pertaining to the transportation of hazardous material.

12. Force Majeure: In the event the Motor Carrier is unable to Interchange Equipment to Provider within the free time as specified in Provider's Addendum, or Provider's applicable Tariff, as a result of Acts of God, war, insurrections, strikes, fire, flood or any like causes beyond the Motor Carrier's control, the Motor Carrier shall be exempted from the per diem charges to the extent of, and for the duration of, the condition that prevented the redelivery of the Equipment. **[Revised 09/13/04]**

13. Attorney's Fees: Should any action be brought by either Party to enforce or for the breach of any other terms, covenants or conditions of this Agreement, either Party shall be entitled, if it shall prevail, to recover reasonable attorneys' fees together with the cost of the suit therein incurred.

14. Notices:

   a. The Provider agrees to provide ten (10) days written Notice to the Motor Carrier of any changes to the terms or conditions of its Agreement Addendum.  The effective date of any change shall be no less than thirty (30) days from the date of notification to Motor Carrier. **[Revised 06/02/05]**

   b. Notices required under this Agreement from Motor Carrier to Provider, or from Provider to Motor Carrier, shall be in writing and sent via e-mail, by confirmed facsimile or by first class mail, postage paid, and properly addressed to IANA. Alternatively, such written Notice can be personally served, sent by registered or certified mail, postage prepaid, or by a national overnight courier or delivery service, properly addressed to the individual shown in the UIIA subscriber record. Either Party, at any time, may change its address by written Notice to IANA via e-mail, fax or mail.  The earlier of (1) the date of receipt or (2) three days after the date such written Notice is given in accordance with this Paragraph shall constitute the initial date of Notice in computing the elapsed time as specified in any Notice requirement in this Agreement. **[Revised 05/12/10]**

   c. In the event it becomes necessary for the Provider to suspend a Motor Carrier's interchange privileges for non-payment of outstanding invoices, Provider shall notify Motor Carrier, via confirmed facsimile, e-mail or letter, no less than 3 business days prior to suspension, that unless the outstanding issue is resolved, suspension of interchange privileges may occur.  The final notification shall include contact information necessary for the Motor Carrier to resolve the outstanding issue. **[Revised 04/26/05]**

15. Multiple Counterparts: The Agreement may be executed in a number of identical counterparts, each of which for all purposes is to be deemed an original, and all of which constitute, collectively, one Agreement; but in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

16. Term: This Agreement shall be effective for a period of one year from its execution and shall continue in effect thereafter for consecutive one year terms unless cancelled in writing, by consent of the Parties, or by any Party upon thirty (30) days prior Notice to the other Party or to the President of IANA.

   A Party whose participation in the Agreement has been cancelled for nonpayment of the IANA Administrative Service Fee may not assert any rights under this Agreement for any Interchange undertaken during the period of the cancellation.

The absence of insurance as required in Section F.6. hereof shall effect immediate cancellation of the Motor Carrier's rights under this Agreement until such time said requirements are again satisfied.

Notwithstanding any other provisions of this Agreement, the obligations and rights of the Parties under Section F.1, 4, 5, and 6 shall survive any cancellation of this Agreement.

H.  Default Dispute Resolution and Binding Arbitration Processes

1.  In absence of a dispute resolution process contained in the Provider's Addendum **that establishes timeframes for signatories to the Agreement to dispute invoices and respond to the dispute with respect to per diem or maintenance and repair invoices,** the following **default** dispute resolution process will apply:

    **Invoiced Party** shall advise **Invoicing Party** in writing of any disputed items on invoices within 30 days of the receipt of such invoice(s).  **Invoicing Party** will respond in writing to such disputed items within 30 days of receipt of **Invoiced Party's** notice.  **The Invoiced Party will have 15 days from the date of the Invoicing Party's response to either pay the claim(s) or seek arbitration.**  Such disputes do not constitute valid grounds for withholding or delaying payments of undisputed charges as required by the Terms of this Agreement. **[Revised 04/14/11]**

2.  **Should no resolution be reached between the Parties for charges disputed within the applicable dispute resolution process, then the Parties will have the ability to submit the disputed charges for binding arbitration in accordance with Exhibit D of the Agreement. The arbitration panel will determine the Party responsible for payment based on the terms and conditions of the Agreement and the Provider's Addendum along with the supporting documentation presented by the involved Parties.**

    **If a Provider's Addendum contains a dispute resolution process that does not include an arbitration provision, then the terms under Exhibit D to the UIIA will apply. [Revised 04/14_/11]**

3.  **Should Invoiced Party fail to dispute an invoice relating to per diem or maintenance and repair charges within 30 days after receipt of the invoice, the Invoiced Party will lose any further right to dispute the invoice under the Invoicing Party's initial dispute process, or in absence of a dispute resolution process in the Provider's Addendum, the default dispute resolution process in Section H.1.  Further, the Invoiced Party, upon failing to dispute the invoice or seek arbitration within the prescribed timeframe, immediately will be responsible for payment thereof to the Invoicing Party and will lose its right to pursue binding arbitration under Exhibit D of the Agreement or assert any other defense against the invoice.  [Revised 04/14/11]**

4.  **Should the Invoicing Party fail to respond to the Invoiced Party's dispute of an invoice relating to per diem or maintenance and repair charges within the established timeframes in the Provider's Addendum, or in absence of a dispute resolution process in the Provider's Addendum, the default dispute resolution process in Section H.1., the Invoicing Party will lose its right to collect such charges and its ability to pursue binding  arbitration under Exhibit D of the Agreement.  [Revised 04/14/11]**

5.  **If any dispute between Invoiced Party and Invoicing Party has not been submitted to binding arbitration as described in this section, and in the event that charges have been verified by Invoicing Party and are again rejected and disputed by Invoiced Party for**

10

**whatever reasons, Invoicing Party and Invoiced Party reserve their rights and remedies under the law regarding the payment of such charges.  Further, the Parties may pursue any rights and remedies they may have under the law to enforce an award of the arbitrators made under this Agreement and Exhibit D, or under the terms of the Provider's Addendum.  [Revised 04/14/11]**

I.    Execution Clause

This Agreement shall be binding upon all Parties, and of full force and effect, at the time of its signing by a duly authorized official of a Party and its acceptance by IANA. An authorized official's signing constitutes the executing Party's representation that the executor possesses such authorization.

Appendix I

ADMINISTRATIVE PROCEDURES

I.   Administration and Implementation

    A.  The Intermodal Interchange Executive Committee (hereinafter called the "Committee"), a Standing Committee of the Intermodal Association of North America, is responsible for the administration and interpretation of the Agreement, and for the processing of changes and/or modifications to the Agreement.  **[Revised 04/06/05]**

    B.  The Chairperson of the Committee shall be the President of the Intermodal Association of North America, who shall serve without voting privilege. The President is responsible for the Administration and Management of IANA and the Agreement, as provided in IANA's bylaws.

        1.  IANA's sole responsibility is to accurately report any information, as provided, that is required for participation in this Agreement. **[Revised 04/20/09]**

    C.  The Committee shall consist of a minimum of two representatives from each mode representing Motor, Ocean and Rail Carriers participating in the Agreement, with an equal representation of each mode. Each representative shall name his or her alternate from their respective mode who shall participate in Committee meetings and serve as the voting member in the absence of the principal representative. Representatives and their alternates must be from companies that are current signatories to the Agreement.  Attendance at meetings is limited to voting members and their alternates.  If Committee members wish to have an industry representative invited to attend a meeting in an advisory capacity, the majority of the Committee must approve of this invitation prior to it being delivered.  **[Revised 04/11/07]**

    D.  To conduct business under the IANA Agreement, a quorum shall consist of the Chairperson and at least two Committee representatives from each involved industry mode or segment.

    E.  Items to be included on the Agenda for any regularly scheduled meeting of the Committee must be provided, in writing, to the Chairperson, at least forty-five (45) days in advance of the meeting date.  Agenda items received less than 45 days prior to a regularly scheduled Committee meeting, will be placed on the Agenda under Other Business, and will be discussed, time permitting. **[Revised 04/06/05]**

    F.  The duties of the Chairperson, shall consist of the following:

        1.  The Chairperson shall be responsible for the day-to-day management of the Interchange program, including marketing and promoting the Agreement among the various segments of the industry; retaining the originals of the signed Uniform Intermodal Interchange and Facilities Access Agreements or amendments thereof; and exchanging information with Committee members concerning new signatories.

        2.  The Chairperson shall maintain a current list of the Parties to the Agreement and shall periodically identify newly terminated participants.

        3.  The Chairperson shall disseminate pertinent information on participating Motor Carriers to Providers in a method mutually agreed to by Providers and the IANA. Entry by new participants to the Agreement shall become effective on the date the Agreement is accepted by the Chairperson as being in compliance.

12

4.  Committee members will be provided with the meeting Agenda and appropriate backup materials, at least thirty (30) days in advance of any regularly scheduled meeting. **[Revised 04/06/05]**

G.  In the absence of a definitive process within these Administrative Procedures, all meetings shall be conducted in accordance with Roberts Rules of Order. **[Revised 04/06/05]**

II.  Review Procedures for New or Revised Providers Addenda

A.  The appropriate modal Committee members will review the Addenda for new Providers and revisions to Addenda for existing Providers. These Committee members will determine whether the Addenda language is consistent with the existing provisions of the Agreement.  Economic terms and those commercial terms that are not appropriate for consideration within the UIIA which are included in the Addenda are not reviewed.  **[Revised 04/11/07]**

B.  A new or existing Provider shall submit Addendum language to the Chairperson of the Committee a minimum of ninety (90) days prior to the effective date of the Addendum. Within ten (10) working days after receipt of new or revised Addendum language, the Chairperson shall forward, through facsimile transmission or mail, and/or by e-mail, a copy of the proposed Addendum language and an evaluation by IANA staff of the conformance of such language with the Agreement to Committee members representing the affected mode(s).  Economic or commercial terms will be deleted from the Addendum before forwarding to the Committee members.  **[Revised 04/06/05]**

C.  Modal Committee members shall review the Addendum language and submit any comments, in writing, to the Chairperson of the Committee within fifteen (15) working days of their confirmation of receiving the new Addendum language, and  **[Revised 04/06/05]**

1.  In the absence of the submission of any adverse comments from the modal Committee members conducting the review, the new or revised Addendum will become effective on the proposed effective date. **[Revised 11/01/06]**

2.  If any modal Committee member questions Addendum language as being in conflict with the Agreement, a conference call shall be held between the Committee members conducting the review, the Provider submitting the Addendum language in question, and a designated IANA staff member.  The purpose of the call will be to discuss the specific provisions in question and shall be held within fifteen (15) working days after the timeframe for Committee review has expired. **[Revised 11/01/06]**

a)  If a majority of the modal Committee members participating in the meeting or conference call determine that the Addendum language conflicts with the Agreement, the Provider will be requested to modify or delete the specified Addendum language. If such revisions responsive to the Committee's determination are made the Addendum will become effective on the proposed effective date. In the event the Provider refuses to modify the Addendum language, participation in the Agreement will be declined. Regarding modifications to existing Addendum language, Provider will be requested to modify or delete the involved Addendum language and will be provided a ten (10) day comment period to respond to the Committee's determination.  Refusal by a Provider to adopt the language modifications will result in the termination of participation in the Agreement.

If a "simple" majority of the modal Committee members participating in the meeting or conference call do not agree on acceptance or denial of the addendum language, the Addendum language in question, will be denied. **[Revised 04/06/05]**

b)  If a majority of the Committee members participating in the meeting or conference call do not agree that the Addendum language conflicts with the Agreement, the Addendum will become effective on the proposed date.

3.  Once Addendum language is approved by the modal Committee members, with the exception of the discovery of a material mistake regarding the consistency of an Addendum provision with the UIIA, no additional requests from Committee members for modifications to the approved language in the Addendum will be entertained for a period of six months from the effective date of the Addendum. **[Revised 04/11/07]**

III. Requests for Interpretation of Agreement Provisions

A.  Requests for interpretations of the Agreement shall be handled initially by informal ruling of the Chairperson in consultation with Committee members representing the industry segments involved. IANA's General Counsel will serve as legal advisor for such consultations. Such interpretations shall be limited to applicability or consistency with existing provisions in the Agreement and/or Provider's Addenda. **[Revised 04/20/09]**

The Party seeking an interpretation shall submit its request in writing to the Chairperson of the Committee, who within seven (7) working days of receipt, shall send a copy to any other party involved in [the particular instance prompting] or known to support the request. Such party shall submit to the Chairperson within seven (7) working days a statement of its position on the matter. The Chairperson shall disseminate both the original request for interpretation and any statements provided by other parties to Committee members representing the involved industry Parties within five (5) working days of receipt. The modal Committee members shall provide the Chairperson with their comments regarding the request for interpretation within ten (10) working days from receipt of information provided by Chairperson. **[Revised 04/06/05]**

B.  The Chairperson shall promptly advise the Party(ies) by facsimile or mail, of the modal Committee members' action on the requested interpretation within five (5) working days. Should the interpretation rendered by the modal Committee members following consideration and determination not be agreed with by the Party(ies) participating in the requested changes or modification, or commenting on the proposed language, such Party(ies), upon a demonstration of new information or previous information not considered or other provisions in the Agreement supporting the proposed language or changes, may request an interpretation by the full Committee. The Committee shall within fifteen (15) working days of request either (1) confirm the determination of the Chairperson. and the modal representatives who made the initial interpretation, (2) render a revised interpretation, or (3) decline further comment because good cause has not been shown for reconsidering the initial interpretation. **[Revised 04/06/05]**

C.  In cases of interpretations which affect Parties other than those involved in a particular request, or whose outcome involves a substantive change in the terms of the Agreement, the Chairperson shall prepare and serve Notice thereof on all Parties via first class U.S. mail.

IV. Requests for Modifications to the Agreement.

A.  The full Committee shall be responsible for considering requests for changes to the Agreement. Such requests shall be submitted in writing to the Chairperson and may be filed by any Party that is a participant in the Agreement. The Chairperson shall transmit the request to the full Committee for consideration at its next scheduled meeting. **[Revised 04/11/07]**

14

B.   The Committee shall consider requests for modification at the next scheduled meeting of the Committee at which a quorum is present and promptly advise petitioner of its decision and reason(s) for that action.  A proposed change to the Agreement will require a three-fourths (3/4's) majority vote of those Committee members in attendance at which a quorum is present. **[Revised 05/12/10]**

V.   Notice of Proposed Modifications to the Agreement and Comment Process

A.   If the Committee votes to propose modifications to the Agreement, the Chairperson shall provide Notice in writing and by posting on IANA website within ten (10) working days of the Committee vote, of the proposed language and effective date of the modifications to all Participants in the Agreement. UIIA Participants shall have thirty (30) days from the date of this notification to provide comments on the proposed change.  Comments must be submitted in writing to the Chairperson, who shall transmit the comments to the full Committee for consideration within ten (10) working days after the close of the thirty (30) day comment period.  The Committee shall consider comments, if received, and vote to approve the proposed modification(s) within fifteen (15) working days from receipt of comments provided by Chairperson.  If a proposed change to the Agreement is not approved by a three-fourths (3/4's) majority vote of those Committee members in attendance at which a quorum is present, the proposed modification will fail. **[Revised 05/12/10]**

Notice of the Committee's final decision will be provided to all Parties within five (5) working days from the close of the period to receive comments from the Committee and the proposed effective date of any changes shall not be less than fifteen (15) days from this date of notification. **[Revised 04/06/05]**

B.   Staff will review existing Addenda for consistency with the approved modification(s).  If changes are required, the Parties must do so within 30 days of this notice of that requirement, and submit the revised Addenda to IANA.  **[Revised 05/12/10]**

VI. Prerequisites for Participation

A.   Parties seeking to participate in this Agreement must first provide to IANA, its officially-registered Standard Carrier Alpha Code (SCAC) as issued by the National Motor Freight Traffic Association, the cost of which shall be borne by the prospective Agreement participant. Failure of the participant to maintain its officially-registered SCAC shall constitute grounds for immediate cancellation of its participation in the Agreement and related Addendum/Addenda.

B.   Parties to this Agreement shall maintain facsimile and electronic communications capabilities on a 24 hour per day, 7 days per week, basis. Failure to provide such communication capabilities can result in the cancellation of this Agreement and related Addendum/Addenda.  **[Revised 04/11/07]**

C.   Upon demand, Motor Carrier shall furnish to the Intermodal Association of North America (IANA), the insurance policies required under this Agreement and/or any participating Equipment Provider's Addendum. Failure of the Motor Carrier to furnish said policy(ies) on demand shall constitute a breach of this Agreement, and shall be cause for immediate cancellation of the Motor Carrier's Agreement.

**D.**   Companies "Doing Business As" another entity will be listed in the UIIA database and in other appropriate documents, by the company name as placarded and/or stenciled on the interchange Equipment. Certificates of insurance must clearly identify said company as having all insurance coverages as required under the Agreement and/or any participating Providers' Addenda. **[Revised 09/01/09]**

15

E.  Motor Carriers must maintain a US DOT Number and, if applicable, an active Motor Carrier operating authority number (MC Number). **[05/12/10]**

VII. Party's Right to Terminate Participation

A.  Any party desiring to terminate participation in this Agreement, as subsequently revised or supplemented, shall so notify the Chairperson, in writing, by Certified mail, prior to the effective date of the modification. The absence of such notification will constitute acknowledgement of the Party's intent to continue to participate in the revised or supplemented Agreement.

VIII. Compliance with the Agreement **[Revised 11/01/06]**

A.  Parties to this Agreement agree to be bound by the provisions of the UIIA, and subsequent amendments and/or revisions of that Agreement, and any addendum thereto, that does not conflict with the terms of this Agreement.

B.  Violations to this Agreement, upon verification by IANA, will be reported to the Party committing the violation, by the Chairman of the IIEC, with a request to correct the action(s) that are not in compliance.

C.  Parties that repeatedly violate the provisions of this Agreement may face cancellation of their participation in the UIIA.


Reorganized and Revised
By Intermodal Interchange Executive Committee: June 19, 2000
Revised:  April 14, 2011

16

# EXHIBITS TO THE

# UNIFORM INTERMODAL

# INTERCHANGE AND FACILITIES

# ACCESS AGREEMENT

# (UIIA)

**Exhibit A to UIIA**
As referenced in Sections D.3.a.1 and F.4.b.
**(Added to UIIA 1/17/08)**

The following list sets forth those items, which the Motor Carrier has responsibility for visually or audibly checking prior to use of the Equipment:

1.  Chassis Twist Locks and Safety Latches – (Check that twist locks and safety latches are engaged and properly secured.)

2.  Slider Pins – (Check that slider pins are engaged for all sliding chassis.)

3.  Bolsters (Check that bolsters are not bent and the container can be secured properly.)

4.  Landing Legs (Check that Landing legs are in 90 degree position and they move up and down properly.)

5.  Sand Shoes (Check that sand shoes or dolly wheels are attached to landing legs and secure.)

6.  Crank Handles (Check that handle is attached, secure and operable to move landing legs up and down.)

7.  Mud Flaps – (Check that mud flaps are whole and properly secured.)

8.  Tires (Check that the following conditions are **not** present.)

    a.  Tire is flat, underinflated or has noticeable (e.g., can be heard or felt) leak.
    b.  Any tire with excessive wear (2/32nds or less thread depth), visually observable bump, or knot apparently related to tread or sidewall separation.
    c.  Tire is mounted or inflated so that it comes in contact with any part of the vehicle.  (This includes any tire contacting its mate in a dual set.)
    d.  Seventy-five percent or more of the tread width is loose or missing in excess of 12 inches (30cm) in circumference.

9.  Rims (Check that rims are not cracked and/or bent.)

10. Rear Underride Guard ("ICC Bumper") (Check that Guard is in place and not bent under the frame.)

11. Electrical Wiring/Lights – (Check that lights are in working order.)

12. Reflectors/Conspicuity Treatments (Check for reflector lenses and presence of conspicuity tape or bar on the 3 visual sides of the chassis.)

13. Brake Lines, Including Air Hoses and Glad Hands – (Check for audible air leaks and proper pressurization only.)

14. Current License Plate (Check to see that it is affixed to equipment.)

15. Proper Display of Hazardous Cargo Placards, In Accordance with Shipping Papers

16. Display of Current Non-expired Federal Placards or Stickers (Check to see that it is affixed to equipment.)

The foregoing list does not include latent defects unless caused by or resulting from the negligent or intentional acts or omissions of the Motor Carrier, its agents, employees, vendors or subcontractors during the Interchange Period.  The foregoing list is without limitation of any federal or state legal requirements applicable to Motor Carrier with respect to use or operation of Equipment.  **[Revised 1/17/05]**

17

**Exhibit B to UIIA**
**Equipment Owners Responsibility**
**(added to UIIA on 07/25/07, Last Revised 4/20/09)**

Repairs made to any item listed in Exhibit B that were a result of damage and not normal Wear and Tear, are the responsibility of the Motor Carrier.

Application for registration papers
Application of vehicle license plates
Axle due to insufficient lubrication
Axle spindle due to insufficient lubrication
Axles
Battery Box Covers
Brake adjustments on trailers or chassis (1) (2)
Brake and brake component repairs (3)
Broken Batteries
Caulking/Sealing of Old Patches
Caulking/Sealing of Seams
Cleaning and adjustment of electrical connector socket
Closed trailer or container roof bows
Component securements, bolts, rivets, welds
Conspicuity treatment
Container Securement Device Handles
Damage to the first three crossmembers (4)
Dolly Axle
Dolly Wheels
Door Locking Bar Handles
Door Tie-backs
FHWA  Inspections
Floor or decking
Heating and/or refrigeration unit repairs
Hub assembly due to insufficient lubrication
Initial + Number Markings
Interior landing gear components
Interior Lining
Interior Posts
Landing Gear Operating Cross shaft
Lift Pads
Lights
Manifest Box
Mud Flaps + brackets
PI Certification
Refrigeration Cabinet Doors
Repairs, renewals or replacement of tires and/or tubes
Replacement of dolly crank handle
Replacement or repair of gladhands
Roll-up doors
Safety Latches
Sand Shoes
Side doors
Sign Boards
Sliding Tandem removable locking bars
Tank container Components
Trailer/Chassis locking assemblies

(1) Not equipped with automatic slack adjusters
(2) Upon Drivers Request with Drivers signature required
(3) Except servicing due to accumulation of ice and snow
(4) Located behind the grid section of trailers not originally equipped with grid extension plate.

18

**Exhibit C to UIIA**
**(Added to UIIA on 07/25/07, Last Revised 09/01/09)**

Motor Carrier Responsibility During the Interchange Period

**Tires**

Tire has body ply or belt material exposed through the tread or sidewall

Tire shoulder and/or tread cut/punctured through one or more plies of fabric when such injury is larger than 1/4".

Slid Flat damage to tire and/or tube - removal of 4/32 of tread or rubber when compared to the remaining tread.

Run Flat damage to tire and/or tube

Missing Tire, tube or rim

**Removable Items**
Missing chains, binders and cables
Missing tarpaulins and securements
Missing tarpaulins bows
Missing rear header bar
Missing bulkhead

**Cut or Torn ( through the thickness of metal)**
Metal door, gate, sheet, post, crossmember, brace or support
DOT Under Ride Guard

**Bent ( where proper operation or function of unit is impaired)**
Metal door, gate, sheet, post, crossmember, brace or support
DOT Under Ride Guard

**Missing Items**
DOT Under Ride Guard
Door or Gate
Removable side or section
Refrigeration unit parts

**Interior**
Interior not free of dunnage, bracing and/or debris
Contamination  (refer to AAR Rule 81 (g) 1-13)

**Other**
Correction of temporary repairs

**Citations**
Citations may be rebilled from the owner to the user of the equipment

The foregoing list does not include Defects as defined in Section B, Definitions of Terms.

19

**EXHIBIT D TO THE UIIA**
**BINDING ARBITRATION PROCESS GUIDELINES**
**(Added to UIIA on 8/1/08)**
**(Last Revised 04/14/11)**

1.  This process is applicable for disputed transactions relating to Maintenance and Repair **or** Per Diem invoices between Providers and Users (Motor Carriers) of Equipment who are signatories to the Uniform Intermodal Interchange and Facilities Access Agreement (UIIA). **[Revised 04/14/11]**

2.  Disputes handled under the arbitration process will be mandatory and binding upon the Parties. The **arbitration** process will be administered exclusively by IANA. **[Revised 04/14/11]**

3.  A three-member arbitration panel will be appointed by IANA to handle disputed invoices submitted for arbitration. The panel will consist of one IANA member from each mode, i.e. a Motor Carrier, Water Carrier and Railroad. However, the decision will be rendered by the two arbitrators representing the modes involved in the disputed invoice(s). The third appointed arbitrator from the mode not involved in the transaction will act as an alternate, and will render a decision only in the event the arbitrators from the involved modes cannot agree on a resolution of the dispute.

4.  Members of the arbitration panels will serve on a voluntary basis without compensation, and for a period of one year. To qualify as an arbitrator the individual must have five years' operating experience involving such matters as gate interchanges, the yard procedures associated with vessels and trains, loading and unloading operations, the operations of marine and rail container yards, the receiving and delivery of containers, and/or with road equipment.

5.  Disputes must be submitted to IANA in writing and in accordance with **Section H.1.** and must be accompanied by a filing fee made payable to IANA to cover the costs of the administration of the **arbitration** process. **[Revised 04/14/11]**

6.  Disputes must be confined to charges arising from Maintenance and Repair (M&R) **or** Per Diem invoices. There will be no limitation on the amount in controversy. Disputed invoices can be consolidated for handling in a single arbitration, provided that they involve the same or related charges. **[Revised 04/14/11]**

7.  The arbitration process will be initiated by the **Invoiced Party** or the **Invoicing Party (Moving Party)** by the filing of a Notice of Intent to Seek Arbitration with IANA by e-mail, facsimile, or overnight mail. IANA will transmit the Notice to the appropriate individual in the **Invoicing Party** or **Invoiced Party (Responding Party)** organization designated to receive such Notice. Within 15 days from the filing of the Notice, the Moving Party must submit its information and arguments to IANA, **who in turn** will submit the documents to the Responding Party. **Failure of the Moving Party to submit the required documentation outlined in the Notice of Intent to Seek Arbitration form within this timeframe, will result in the claim being rejected. [Revised 04/14/11]**

8.  Responding Party will have 15 days from the date **that** the **arbitration** documents are sent to it by IANA to respond. Upon receipt of the Responding Party's documents, the complete record will be transmitted by IANA to the arbitrators. **Failure of the Responding Party to respond to the claim within this timeframe will result in the arbitration panel rendering its decision based solely on the supporting documentation submitted by the Moving Party, along with the terms and conditions of the UIIA and/or the Providers' Addenda. [Revised 04/14/11]**

9.  The arbitration panel will have 45 days from the date the information and arguments submitted by the Parties are sent by IANA to render a written decision indicating the basis for its conclusions. Its findings will address the validity of the claims and the Party responsible for payment or satisfaction thereof. The determinations are to be based solely on the rules in the UIIA and the rules and charges in the Provider's Addendum. **[Revised 09/01/09]**

**Exhibit D of the UIIA (continued)**

10.    If during an arbitration panel's deliberations it appears that further clarification or explanation is needed from a Party or the Parties, a conference call may be conducted with both Parties in the arbitration process participating in the call.

11.    The decision of the arbitration panel will be transmitted to IANA which will, in turn, forward the decision to the Parties by e-mail, facsimile, or overnight mail. The decision of the arbitration panel is final and no appeal is permitted.

12.    If any part of an invoice submitted for arbitration is not disputed that part must be timely paid and cannot be withheld during the arbitration process. In response to the arbitration panel's decision, order of reimbursement, payment or cancellation of the invoice must occur within 15 days from the date of receipt of the arbitrators' decision. **[Revised 05/12/10]**

13.    The cost of the filing fee is assessed against the Party against whom the arbitrators' decision is rendered. Should the filing fee have been paid by the prevailing party, it is entitled to reimbursement by the losing party.

14.    Once the arbitration process has been initiated, no suspension, cancellation, termination or any type of interruption of the Motor Carrier's interchange privileges for the disputed claims may occur.  The Provider and Motor Carrier, nevertheless, retain all their rights and remedies for the enforcement of the **binding arbitration** decision. **[Revised 04/14/11]**

15.    Initiation of the arbitration process by a Motor Carrier does not preclude a Provider from suspending, cancelling, or terminating the interchange privileges of this Motor Carrier for reasons not related to the subject of the disputed claim and that are governed by the provisions of the UIIA and/or the Provider's Addendum.  **[Revised 09/01/09]**

16.    Invoices submitted for **arbitration** must arise on or after the announced effective date of the implementation of the program, which is August 1, 2008. **[Revised 04/14/11]**

17.    Except for the decision by the arbitration panel, all documents, including e-mails, and oral and written communications generated under the **Binding Arbitration** Process and/or submitted by the **Invoicing Party** and **Invoiced Party** are confidential, and will not be released by IANA to any other person without the express written consent of all Parties to the arbitration.  **[Revised 04/14/11]**

**UIIA ADDENDUM TEMPLATE**

Listed below is the universe of economic issues that the Intermodal Interchange Executive Committee has approved for inclusion in each participating Provider's Addendum to the Uniform Intermodal Interchange and Facilities Access Agreement (UIIA).

Providers who subscribe to this Agreement will utilize this template in creating their individual Addenda. They are not required, nor are they expected, to utilize every component listed below in creating their proprietary Addendum. For example, certain of the Addendum template provisions are more germane to rail-truck Interchange than water carrier-truck Interchange, and vice-versa.

The Parties may not use this Addendum to obviate or undermine the intent of the Agreement. For example, the Agreement contemplates certain reimbursements for the cost of repairs. The Parties may agree to limit the potential cost of those repairs, but such limitations may not be so restrictive that they would virtually eliminate responsibility for reimbursement.

It will be impermissible for Provider Agreement subscribers unilaterally to add other provisions to their individual Addendum to this Agreement. Requests for addition(s) to the universe of economic issues that can be utilized in an Addendum to this Agreement shall be submitted to the Intermodal Interchange Executive Committee for consideration as set forth in Part II, Implementation, Review, Interpretation and Modification Procedures.

I. **Notification and Free Time**
A. Free Time Commences
B. Amount of Free Time
   1. **Load/Empty**
   2. **Load/Load**
   3. **Empty/Load**
C. Weekends – interruption of expiry of free time
D. Holidays – interruption of expiry of free time
E. Unroadworthy Equipment – suspension of expiry of free time
F. Interchange to Inland Carrier – equivalent of termination

II. **Origin Storage**
   A. Free Time Commences
   B. Amount of Free Time
   C. Charges Per 24-hour Period

III. **Destination Storage**
   A. Free Time Commences
   B. Amount of Free Time
   C. Charges Per 24-hour Period

IV. **Per Diem and Trailer Detention**
   A. Type of Equipment
      1. Free Time Allowance
      2. Per Diem
         a) Day 1 – _____
         b) Day _____ – _____
         c) Day _____ – _____

V. **Method of Invoice Dispute Resolution**

VI. **Other Charges**
   A. Empty to Empty
   B. Crossover
   C. Failure to File Crossover Interchange
   D. Hazardous/Municipal Waste
   E. OTHER

VII. **Damages to Equipment**
   A. Method of Determining Cost
   B. Other

VIII. **Repairs to Equipment**
   A. Tires
   B. Other

IX. **Lost, Stolen or Destroyed Equipment**
   A. Suspension of Per Diem
   B. Disposition of Destroyed Equipment

X. **Insurance**
   A. Amounts of Additional Required Coverage by Class
   B. Limitations on Rating Level of Insurer
   C. Self-Insurance and Minimum Permissible Deductibles

2/10/99
Last Revised 03/01/11

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV11- 2952 SJO (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[_] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[_] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| ELITE LOGISTICS CORPORATION, and on behalf of all others similarly situated | MOL (AMERICA), INC., and DOES 1-10 |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| MCCUNEWRIGHT LLP        (909) 557-1250 2068 Orange Tree Lane, Suite 216 Redlands, California  92374 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No        ☐ MONEY DEMANDED IN COMPLAINT: $_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. 1332 - Unfair Business Practice (Cal. Bus. & Prof. Code Section 17200); Breach of Contract

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☒ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☒ 840 Trademark |
| ☒ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **REAL PROPERTY** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 210 Land Condemnation | **IMMIGRATION** | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 690 Other | ☒ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | **FEDERAL TAX SUITS** |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 446 American with Disabilities - Other | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 290 All Other Real Property | ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | | ☐ 871 IRS-Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**     Case Number: _____     CV 11 - 02958 SJO

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                         CIVIL COVER SHEET                         Page 1 of 2

APR - 7 2011

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)     ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                                 ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                                 ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                                 ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐    Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐    Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | MOL (AMERICA) INC. - Delaware and New York |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date April 7, 2011

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

David C. Wright, SBN 177468
McCuneWright, LLP
2068 Orange Tree Lane, Suite 216
Redlands, CA  92374

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | CASE NUMBER |
|---|---|
| ELITE LOGISTICS CORP., *Corporation,* and on behalf of all others similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>MOL (AMERICA), INC., and DOES 1-10,<br><br>DEFENDANT(S). | CV 11 - 02952  SJO<br><br><br>**SUMMONS** |

TO:  DEFENDANT(S):  MOL (AMERICA), INC., and DOES 1-10,

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☒ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, David C. Wright , whose address is 2068 Orange Tree Lane, Suite 216, Redlands, CA 92374 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

TERRY NAFISI

Clerk, U.S. District Court

Dated:  APR - 7 2011

By: _____
Deputy Clerk

(Seal of the Court)

[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].